IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GREENTREE MEDICAL CENTER, P.C., <br><br> Plaintiff, <br><br> v. <br><br> MATTHEW S. BURKETT, DNP, <br><br> Defendant. | CASE NO. 2:23-cv-1468 <br><br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT**

AND NOW comes Plaintiff Greentree Medical Center, P.C. (***"Plaintiff" or "GTMC"***), through its undersigned counsel, and respectfully submits this Complaint and in support thereof pleads as follows:

**INTRODUCTION**

1. Plaintiff brings this Complaint against its former employee to address his misuse of Plaintiff's protected computers and trade secrets during or after his employment to fraudulently divert cash to himself and to improperly alter or affect medical and billing records.

**THE PARTIES**

2. Plaintiff Greentree Medical Center, P.C. is a Pennsylvania professional corporation providing primary healthcare throughout the region, with offices in both Pittsburgh, Pennsylvania (in Allegheny County near Green Tree, Pennsylvania) and in Rices Landing, Pennsylvania (in Greene County).

3. Defendant Matthew S. Burkett, DNP (***"Defendant" or "Burkett"***) is a healthcare professional that previously worked as an at-will employee of GTMC primarily at its Rices

Landing location until he resigned in lieu of cooperating with a GTMC internal investigation in July 2023.

4.     Burkett is not—and never was—an owner, shareholder, partner, or otherwise entitled to ownership of GTMC or any of its affiliates or assets in any way.

**JURISDICTION AND VENUE**

5.     This Court has subject matter jurisdiction over these claims pursuant to 18 U.S.C. § 1030, 18 U.S.C. § 1836, and 28 U.S.C. § 1331.

6.     This Court has personal jurisdiction over Burkett under Federal Rule of Civil Procedure 4(k)(1)(A) and 42 Pa. C.S. § 5322(a) because Burkett is a Pennsylvania citizen, was employed by GTMC in Pennsylvania, engaged in the conduct complained of herein at times while in Pennsylvania, and has applied for (and received) multiple licenses from the Pennsylvania State Board of Nursing.

**7.**     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2).

**FACTUAL BACKGROUND**

*GTMC's Operations, Trade Secrets, and Protected Computers*

8.     GTMC—through both the compensated efforts of Burkett while employed and through the efforts of several other GTMC employees—worked hard over several years to build a sustainable healthcare practice by forming relationships with and providing well-informed and well-documented medical care to patients in the communities near Rices Landing, Pennsylvania.

9.     Given the relative lack of healthcare providers in rural areas and the proximity of Rices Landing to Pennsylvania's border with West Virginia, patients from both Pennsylvania and West Virginia come to GTMC in Rices Landing for primary care.

10. GTMC purchased office space, computers with Internet access used to submit invoices affecting interstate commerce, telephones, software likewise affecting interstate commerce, physical signage/advertisements, virtual advertisements, and medical equipment in addition to paying numerous employees (including Burkett) to accurately collect and store substantial amounts of confidential information essential to GTMC business.

11. GTMC also expended significant effort to enter into contracts with numerous insurers and payors, including Medicare, Medicare Advantage Plans, Medicaid, employer-based health insurance plans, commercial insurance companies, and exchange-based insurance plans.

12. While Burkett was employed by GTMC, he had access to information with independent economic value that GTMC took reasonable measures to keep secret.

13. Specifically, Burkett was authorized to access electronic health records (*"EHR"*) and related billing records for the limited purpose of providing and documenting proper medical diagnosis, treatment, and payment.

14. GTMC's EHR database contains extensive information such as patient names, contact information, medical history, current ailments, current prescriptions issued by a GTMC provider, expiration dates for such prescriptions issued by a GTMC provider, medications taken by a patient pursuant to self-care or prescriptions from other healthcare providers, preferred pharmacy, any applicable insurer, and numerous other details both required for effective medical treatment and for the business of a successful healthcare practice.

15. Likewise, GTMC's billing database contains extensive information such as patient names, contact information, services rendered, diagnoses, prescriptions, insurer(s) (if any), specific plan(s) of coverage (if any), co-insurance or co-payment history, preferred method of payment, notations of cash payments for elective services or aesthetic services otherwise not

covered by insurance, billing history, collections history (if any), and numerous other details both required for proper invoicing to the correct payor(s) and for the business of a successful healthcare practice.

16. The information in GTMC's EHR and billing data has substantial independent economic value by showing, among other things, which patients routinely seek aesthetic procedures, which patients pay in cash, which patients are consistently compliant with their prescribed courses of medical treatment, which patients/payors pay profitable rates for medical care, and which patients are likely to need and accept frequent medically necessary care for chronic conditions and thus result in predictable income to a medical practice if onboarded to that practice.

17. GTMC took substantial efforts to keep its EHR and billing data confidential, including without limitation training employees on the need for confidentiality, requiring employees to abide by security and confidentiality requirements as conditions of their ongoing employment, limiting access to the data systems with passwords and specific user account permissions, using multi-layer physical and cyber security measures to prevent unauthorized access to the data, and entering into contractual arrangements with insurers or other relevant entities to ensure that confidentiality would be maintained when limited amounts of relevant data was shared for authorized purposes.

18. Indeed, federal law imposes substantial requirements on healthcare practices to keep EHR and billing data private, confidential, and accessible only to the patient or individuals otherwise acting within an authorized scope—even when that data is used for financial, business-evaluation, or other purposes benefitting a medical practice rather than a patient. *See, e.g.*, HIPAA Privacy Rule at 45 C.F.R. Part 160 & subparts A & E of Part 164.

***Burkett's Improper Conduct While Actively Employed by GTMC***

19. In or around March 2023, Burkett began to use GTMC's data, inventory, staff, and computers for his own personal financial gain rather than for the benefit of GTMC.

20. Specifically, Burkett began accepting cash payments directly from patients and pocketing the money rather than inputting any cash receipt into GTMC's billing system or otherwise putting the cash received into GTMC's cash drawer or account.

21. GTMC has numerous diabetic patients as well as numerous overweight or obese patients seeking assistance with weight loss.

22. Mounjaro is an FDA-approved medication for the treatment of diabetes.

23. Mounjaro is frequently prescribed by healthcare practitioners for weight loss as a legal "off-label" (not FDA-approved) use where otherwise judged appropriate for use by a patient in the practitioner's professional opinion.

24. Health insurance companies typically cover the cost of Mounjaro when prescribed for diabetes.

25. Health insurance companies may not cover or may not accept the medical necessity of prescribing Mounjaro for weight loss, considering it instead an elective course of treatment, an aesthetic treatment, or otherwise excluded from coverage.

26. Likewise, office visits associated with diabetes management or initial weight loss counseling are typically covered by health insurance while medically unnecessary visits are not covered by health insurance.

27. Mounjaro comes in various doses but always in a prepackaged and refrigerated single-use injector with a weekly dose that goes into the stomach, thigh, or upper rear arm.

28. Mounjaro is an expensive medicine that is often in high demand and short supply because of its current patented status, various uses, and generally successful outcomes known to date for both diabetes management and weight loss.

29. While many diabetics (or weight-loss patients) can learn to inject themselves, other patients prefer to have weekly office visits to receive the injection for a variety of reasons such as frailness, lack of manual dexterity, vision issues, fear of needles, a prior adverse event when self-injecting, concern over being alone if a side effect occurs, or general convenience because other concurrent treatments also require weekly visits.

30. Consistent with professional and ethical healthcare standards, GTMC requires its providers to educate its patients regarding Mounjaro, prescribe it where indicated, bill to insurers where appropriate, and invoice the patient if the medication will not be covered by insurance but is still appropriate and desired.

31. Likewise, consistent with professional and ethical healthcare standards, GTMC requires its providers to educate its patients on self-injection and prescribe Mounjaro in an appropriate dosage for offsite use while making accommodation for patients requiring or preferring onsite injection—recording all treatment and billing accordingly in GTMC's EHR and billing systems.

32. GTMC obtains Mounjaro from its typical pharmaceutical wholesalers at agreed-upon rates and stores Mounjaro onsite in a designated area with other medications that need refrigerated.

33. In or around March 2023, Burkett began to remove Mounjaro from GTMC's main inventory refrigerator and store it in a smaller refrigerator that he kept in his office at Rices Landing.

34. Burkett also began advising GTMC weight-loss patients that they could pay him in cash directly for a Mounjaro injection rather than paying the GTMC front desk where all payments were typically handled.

35. To conceal his thefts from GTMC medicine inventory and to conceal his theft of cash payments otherwise due to GTMC, Burkett used his access to GTMC's EHR and billing systems to improperly alter information in patient records.

36. For instance, if a GTMC intake nurse noted that a patient subject to Burkett's scheme reported taking Mounjaro when stating what medications the patient currently used, Burkett would delete that information, alter the record to make it appear as if a non-GTMC practitioner had prescribed and administered the Mounjaro, and/or enter his office-visit notes without recording his prescription and administration of Mounjaro to the patient.

37. In other instances, Burkett overprescribed Mounjaro and recorded or altered dosing instructions within the EHR system to create surpluses of Mounjaro for him to privately sell.

38. The "overprescription" scheme, for instance, saw Burkett record a 10 mg prescription for Mounjaro for a given patient while the dosing instructions for that patient only called for a dosing of 5 mg—leading to 5 mg from the prescription that Burkett could extract from the self-injector and sell for cash to another patient.

39. Upon information and belief, Burkett facilitated his scheme by improperly accessing and using data in GTMC's EHR and billing systems to maintain contact with patients through personal cell phones, text messages, and social media profiles to bypass the GTMC front desk for appointments, bypass the GTMC front desk for billing instructions, and to request that patients bring extra Mounjaro doses to him.

40. Upon information and belief, Burkett's scheme was not limited to the administration of Mounjaro but also involved other medications that Burkett would administer (or pretend to administer) in return for cash payments.

41. Upon information and belief, Burkett also failed to accurately document the administration of these other medications (or placebos) as well.

42. Upon information and belief, Burkett directed his scheme toward GTMC patients from both Pennsylvania and West Virginia.

43. Burkett's scheme affected at least one invoice in interstate commerce.

44. Upon information and belief, Burkett's scheme affected at least one patient who was insured in whole or in part by a Medicare or Medicaid plan.

45. Burkett's scheme began to unravel when he was observed storing and transporting Mounjaro in an unusual manner (including within his office and within his backpack to and from his vehicle), using a syringe to extract or administer Mounjaro (rather than dispensing from a prepacked single-use injector), taking cash from patients, altering EHR data, failing to properly enter EHR data after a known injection, and otherwise providing unusual instructions to patients that manifested in problems at GTMC's Rices Landing location (such as overbooking, unscheduled appointments, strange inquiries about how to get medicines to Burkett, and patient statements that services and/or payments had been provided when the EHR and/or billing systems did not show such information).

46. Upon information and belief, Burkett began to solicit GTMC patients to see him outside of GTMC offices to obtain an injection and pay in cash in a way that would not be observable to GTMC staff.

47. Burkett also continued to see patients at GTMC's office, taking precautions to conceal his activities by continuing to improperly communicate with patients, improperly instruct patients, alter GTMC EHR and billing records, divert cash payments, and improperly require subordinate GTMC staff not to bill certain patients (or to bill at a lower unauthorized rate).

48. Burkett's actions were intentional, were not authorized in any way by GTMC, led to fraudulent communications entering into interstate commerce that led to improper payments to Burkett, were furthered by Burkett's improper access and use of GTMC's EHR and billing systems, and violated Burkett's professional training and licensing requirements in a number of ways.

49. In particular, accurate EHR data is essential for patient safety, such as when a patient reports to an emergency room or urgent-care center for treatment and a full list of that patient's prescriptions and medications is required to diagnose conditions (including potential side effects that may be manifesting from one of the prescriptions).

50. GTMC, insurers, and patients all rely on accurate data in the GTMC EHR and billing systems.

51. Likewise, GTMC and patients relied on and expected Burkett to act in accordance with applicable professional and ethical healthcare standards and give sound medical advice.

52. Burkett did not give sound medical advice when he incorrectly told certain patients that they must come into the office or otherwise see him for weekly injections to continue their prescribed courses of treatments; in such instances, this advice was given merely to bring more cash to Burkett's pockets by obtaining direct payment from patients by steering them away from typical pharmacies and self-injections.

### *Burkett's Improper Conduct While Restricted or Suspended by GTMC*

53. On or around June 30, 2023, multiple initial reports of some of Burkett's misconduct were made to GTMC.

54. Preliminary review of the reports and relevant documentary data suggested that merit to some or all of the reports could exist.

55. On June 30, 2023, Burkett was placed on notice of inquiry and told to stop administering or dispensing any Mounjaro at GTMC's Rices Landing site without his supervising medical doctor being physically on site to directly administer or dispense the medicine.

56. Burkett was specifically informed that he could and should raise any concerns with continuing patient care with his supervising medical doctor.

57. Burkett was also specifically informed that he should not edit any EHR that was subject to a pending audit.

58. Burkett's access to Mounjaro was restricted by GTMC, and all known spaces where Mounjaro was stored at Rices Landing were purged of Mounjaro and placed under strict control.

59. Over the course of the following week, Burkett continued his prior misconduct and repeatedly violated the conditions imposed upon him.

60. Burkett continued to inject patients with Mounjaro from unknown sources, apparently continuing to collect Mounjaro from patients, split doses, and otherwise evade GTMC controls.

61. Upon information and belief, on at least one occasion, Burkett could not access GTMC's Mounjaro and was apparently not in possession of Mounjaro from other sources, so he administered a syringe of saline to a patient, falsely told the patient it was Mounjaro, and accepted cash payment from that patient as if the injection had been Mounjaro.

62. Burkett did not report any of his conduct to his supervising medical doctor or any other appropriate authority.

63. Burkett did not raise any concern regarding any particular patient's care or any emergency circumstance that would warrant Burkett's flouting of GTMC's restrictions upon him.

64. Burkett continued to access records under audit, alter those records, falsify new records, fail to complete records, omit or alter key data when exceeding his authority to access EHR and billing records, and administer Mounjaro while siphoning payment for it from GTMC.

65. Indeed, now aware of the inquiry but without yet having given GTMC any notice of his purported intent to leave, Burkett told several GTMC patients that he planned to leave GTMC within a month and solicited those patients to come with Burkett to a to-be-determined practice he was purportedly creating or joining.

66. Likewise, upon information and belief, Burkett continued and expanded his efforts to divert cash-paying weight-loss patients to his care outside of GTMC facilities in an unauthorized, inappropriate, and careless manner to avoid continued surveillance, documentation review, and detection of his scheme.

67. Given Burkett's reported violations of his restrictions, he was placed on paid suspension pending further investigation on July 7, 2023.

68. Burkett's oral and written suspension notice specifically required him to stop seeing GTMC patients, return all GTMC property in his possession, refrain from initiating contact with any GTMC patient, and lawfully maintain and refrain from using all GTMC trade-secret data known to him.

69. Burkett violated these suspension conditions by initiating contact with GTMC patients and soliciting them to continue being served by him.

70. Burkett failed to tender any GTMC property in his possession to GTMC.

71. Upon information and belief, Burkett had—and continues to have—substantial portions of GTMC's confidential data in his possession stored within his electronic devices.

72. Burkett methodically contacted dozens of GTMC patients during the course of his paid suspension to spread false information about GTMC, GTMC employees, available treatments at GTMC, and the reasons for his absence from GTMC facilities and to solicit patients to other practices with which Burkett hoped to associate.

73. Ultimately, Burkett's continued malfeasance resulted in his suspension being converted to an unpaid suspension and the strict enforcement of a requirement that he fully cooperate with an internal investigation (including sitting for an interview) to even have a chance to be reinstated.

74. Burkett chose to resign his employment from GTMC in lieu of being interviewed.

75. Despite Burkett's resignation from GTMC, he continues to have legal obligations to respect GTMC's trade secrets to which he was exposed during the course of his employment.

76. Burkett has failed to respect the confidentiality of data known to him due to his prior access to GTMC EHR and billing systems.

77. Burkett has increased his efforts to methodically contact and solicit GTMC patients, going well beyond merely providing notice of a new professional affiliation.

78. Burkett knowingly and with the intent to misuse confidential information known to him during the course of his GTMC employment has focused his solicitation efforts on specific patients known to him to have chronic conditions (including mental illness or attachment issues), consistent payment histories, and other traits that would be advantageous to him personally in creating or joining another medical practice.

79. Burkett is also reaping the fruits of his months-long scheme to improperly access and misuse GTMC EHR and billing data to impede GTMC's accurate recordkeeping, outreach, billing, and retention of its patients.

80. Without Burkett's substantial misconduct, GTMC would have retained several patients that have since left GTMC's practice to avoid both GTMC and Burkett.

81. Likewise, without Burkett's substantial misconduct, upon information and belief, GTMC would have retained additional patients that are now being seen by Burkett privately (and illegally) or by Burkett in connection with a forthcoming association he is creating with a different competing medical practice.

### COUNT I: VIOLATION OF COMPUTER FRAUD AND ABUSE ACT
### (18 U.S.C. § 1030(a)(4))

82. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

83. Burkett knowingly and with the intent to defraud accessed GTMC protected computers.

84. Burkett's access to GTMC's protected computers exceeded his authorized access.

85. Burkett's unauthorized access to GTMC's protected computers furthered his intended fraud and allowed him to obtain cash payments from patients, his wages, and other things of value to which he was not otherwise entitled while engaged in his scheme to defraud.

86. Burkett received well in excess of $5,000 cash from patients that should have gone to GTMC coffers.

WHEREFORE, GTMC respectfully requests that judgment be entered in its favor together with pre- and post-judgment interest, costs, legal fees, and expenses against Burkett.

## COUNT II:  VIOLATION OF COMPUTER FRAUD AND ABUSE ACT
### (18 U.S.C. § 1030(a)(2)(C))

87. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

88. Burkett intentionally accessed GTMC computers.

89. GTMC's computers in this context are protected computers because they are used in and affect interstate commerce by virtue of transmitting medical records, insurance claims, and patient invoices over the Internet and across state lines for purposes of receiving proper payments.

90. Burkett's access to GTMC's protected computers exceeded his authorized access.

91. Burkett obtained information from GTMC's protected computers.

92. Burkett's conduct caused the modification or impairment—or the potential modification or impairment—of the medical examination, diagnosis, treatment, or care of one or more individuals.

WHEREFORE, GTMC respectfully requests that judgment be entered in its favor together with appropriate injunctive relief, equitable relief, compensatory damages, pre- and post-judgment interest, costs, legal fees, and expenses against Burkett.

## COUNT III:  VIOLATION OF DEFEND TRADE SECRETS ACT
### (18 U.S.C. § 1836(b)(1))

93. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

94. GTMC's EHR and billing data are trade secrets.

95. GTMC owns those trade secrets.

96. Burkett has no claim of ownership over those trade secrets.

97. Those trade secrets relate to healthcare services used in and intended for use in interstate commerce.

98. Burkett has misappropriated GTMC's trade secrets by improperly using those trade secrets during and after his employment with GTMC for his own personal financial advantage rather than for the financial benefit of GTMC or for the proper medical treatment (emergency or otherwise) of any GTMC patient.

WHEREFORE, GTMC respectfully requests that judgment be entered in its favor together with appropriate injunctive relief, monetary damages for actual loss incurred by GTMC, monetary damages for unjust enrichment received by Burkett, exemplary damages for twice the compensatory amounts awarded, pre- and post-judgment interest, costs, legal fees, and expenses against Burkett.

Dated:  August 15, 2023

/s/ Joseph A. Valenti
Joseph A. Valenti (Pa. I.D. No. 306788)
joe.valenti@saul.com
John A. Marty III (Pa. I.D. No. 324405)
john.marty@saul.com
Saul Ewing LLP
One PPG Place, Suite 3010
Pittsburgh, PA  15222
Telephone:  (412) 209-2500
Facsimile:  (412) 209-2570

*Counsel for Plaintiff Greentree Medical Center, P.C.*